# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

RODNEY L. EMIL,

     Petitioner

v.

WILLIAM GITTERE, et al.,

    Respondents

Case No.: 3:00-cv-0654-KJD-CLB

**ORDER**

Before the court for a decision on the merits is an application for a writ of habeas corpus filed by Rodney L. Emil, a Nevada prisoner sentenced to death. ECF No. 244.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Emil was convicted in 1988 of first degree murder with the use of a deadly weapon and sentenced to death for killing his stepfather, Charles Emil.[1] *See Emil v. State*, 784 P.2d 956 (Nev. 1989). The conviction and sentence were affirmed on appeal. *Id*. In its opinion deciding the direct appeal, the Supreme Court of Nevada recounted the facts of the case as follows:

> The facts adduced at trial presented a scenario that commenced on June 17, 1984, when Frederick Woodall, Alan Carmack and Emil met at Woodall's home for a barbecue. When Emil arrived, he explained that he needed to meet with his stepfather, Charles Emil. Shortly thereafter, Carmack, Emil and Woodall left in Carmack's pickup truck to go purchase barbecue supplies. At the grocery

---

[1] To avoid confusion with the petitioner, Charles Emil is often referred to as just "Charles" in this order.

store, Emil told Woodall that he had to call his stepfather.

After purchasing the supplies, Carmack and Woodall entered the cab of Carmack's truck and Emil climbed into the truck's bed. The trio then drove to a desert area south of Tropicana Road on Rainbow Boulevard in Las Vegas. Carmack pulled his truck alongside a white pickup truck parked just off the road. Woodall testified that Emil immediately stood up in the back of Carmack's truck, pulled a revolver from a paper bag and fired four shots at the occupant of the white truck. The victim moved toward the passenger door and slumped down onto the floor. One of the shots shattered the passenger window.

Woodall testified that when he realized what had happened he and Carmack left the scene as Emil jumped from Carmack's truck and proceeded to chase them in the victim's truck. Woodall stated that Emil forced Carmack off the road at gunpoint and then told Woodall and Carmack that their families would be harmed if they ever told anyone about the shooting. Emil then entered Carmack's truck and the three men drove away, leaving the victim's truck behind.

Officer Dennis Cobb of the Las Vegas Metropolitan Police Department was the first police officer to arrive at the crime scene. Cobb observed a white male lying on the floorboard of the white truck. The passenger window was broken but no glass fragments were found outside of the vehicle. The registered owner of the vehicle was Charles Emil.

The body in the vehicle was later identified as Charles Emil. An autopsy revealed that the victim had been shot four times. Death was the result of a bullet that passed through the victim's neck, cutting his carotid artery, causing massive hemorrhaging.

A little over a year after Charles Emil was killed, Woodall, who had been incarcerated for a probation violation, told police officers that he had information regarding the June 17, 1984, Rainbow Boulevard shooting. Woodall testified that he waited a year because he feared for the safety of his girlfriend and their son. When he finally reported the details of the shooting, he also directed a Las Vegas Metropolitan Police Department detective, Michael Geary, to the crime scene where Geary discovered broken automotive glass fragments. Woodall also told police that approximately two weeks before the victim was killed, Emil told Woodall that $10,000 could be made if his stepfather was killed.

Martin Koba, who knew Emil, testified that in May or June, 1986, he came upon a group of three or four people, including Emil, and although he was three or four feet away from them, he was able to overhear the conversation and specifically heard a voice that sounded like Emil's saying something to the effect that "my mother hired my buddy and me to kill my stepfather." He then heard the same person refer to the purpose for the killing in terms of a possible recovery of insurance policy proceeds.

2

1  *Id*. at 957-58.

2        In May 1990, Emil filed a motion for a new trial that was denied by the state district court

3  and on appeal. ECF No. 191-2 at 1-41. In July 1992, Emil initiated state post-conviction

4  proceedings. *Id*. at 43-61. Those proceedings lasted until August 2000 when the Supreme Court

5  of Nevada denied a motion to rehear its order dismissing Emil's appeal. ECF No. 1 at 82-94.

6        This federal habeas corpus action was initiated in December 2000. ECF No. 1. After

7  appointment of counsel and several years of discovery, Emil filed an amended petition in March

8  2006. ECF No. 135. Shortly thereafter, the action was stayed, upon a stipulation of the

9  parties, from May 2006 to January 2011, pending a state-court habeas action. ECF Nos.

10  159/174.

11        In March 2013, Emil filed a third amended habeas petition. ECF No. 212. After

12  respondents filed a motion to dismiss (ECF No. 216), Emil filed a motion for stay, which was

13  granted in November 2013. ECF Nos. 220/229. The stay was lifted in January 2017. ECF No.

14  241. Emil filed his fourth amended petition in March 2017. ECF No. 244.

15        In April 2018, respondents moved to dismiss, arguing that several of Emil's habeas

16  claims are untimely, procedurally defaulted, unexhausted, or not cognizable in this proceeding.

17  ECF No. 255. In an order entered in September 2019, the court dismissed Claims 1C, 2C, 2E, 4,

18  5C, 5D, 5E (in part), 7C, 7D, 8, 10B2, 11B1, 11B3, 12B1-5, 13, 14, 16, 18(i), 18(j), 19, and 20.

19  ECF No. 287. The court now addresses Emil's remaining claims.

20        II.  STANDARDS OF REVIEW

21        This action is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA).

22  28 U.S.C. § 2254(d) sets forth the standard of review under AEDPA:

23                An application for a writ of habeas corpus on behalf of a person in custody
               pursuant to the judgment of a State court shall not be granted with respect to any

claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Emil v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id*. at 409. "[A] federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.

The Supreme Court has explained that "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997); *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

4

The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

"[A] federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004); *see also Miller-El*, 537 U.S. at 340 ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, § 2254(d)(2).").

For any habeas claim that has not been adjudicated on the merits by the state court, the federal court reviews the claim de novo without the deference usually accorded state courts under 28 U.S.C. § 2254(d)(1). *Fox v. Johnson*, 832 F.3d 978, 985 (9th Cir. 2016) (citing 28 U.S.C. § 2254(d)); *Chaker v. Crogan*, 428 F.3d 1215, 1221 (9th Cir. 2005); *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2002). However, the provisions of 28 U.S.C. § 2254(e) still apply in such instances. *Pirtle*, 313 F.3d at 1167–68 (stating that state court findings of fact are presumed correct under § 2254(e)(1) even if legal review is de novo); *Pinholster*, 563 U.S. 185 ("Section 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief."). Also, because de novo review is more favorable to the petitioner, federal courts can deny writs of habeas corpus under § 2254 by engaging in de novo review rather than applying the deferential AEDPA standard. *Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

III.  ANALYSIS OF CLAIMS

**_Brady_ Claims**

In Claims 1B, 1D, 1E, and 1F, Emil alleges that he is entitled to habeas relief because the State suppressed exculpatory evidence in violation of the U.S. Constitution and _Brady v. Maryland_, 373 U.S. 83 (1963). The Fourteenth Amendment's Due Process Clause requires State prosecutors to disclose "evidence favorable to an accused ... where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." _Brady_, 373 U.S. at 87. To obtain habeas relief, a petitioner must show that the evidence was: (1) favorable to the accused; (2) suppressed by the prosecution; and (3) prejudicial. _See Strickler v. Greene_, 527 U.S. 263, 281–82 (1999). "Any evidence that would tend to call the government's case into doubt is favorable for _Brady_ purposes, including exculpatory and impeachment evidence." _Ochoa v. Davis_, 16 F.4th 1314, 1327 (9th Cir. 2021) (internal quotations and citations omitted). The prosecution's failure to disclose evidence is prejudicial "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." _United States v. Bagley_, 473 U.S. 667, 682 (1985). "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence [the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence." _Kyles_, 514 U.S. at 434.

*Claim 1B*

In Claim 1B, Emil alleges that the State suppressed evidence and presented perjured testimony regarding benefits provided to Frederick Woodall in exchange for his testimony. While in jail on an unrelated matter, Woodall contacted the police in July 1985, approximately one year after Charles Emil's murder. As described in the direct appeal decision excerpted

above, he subsequently provided the only eye-witness testimony at trial establishing Rodney

Emil as the person responsible for the murder.

At trial, Woodall testified that he contacted the police about the murder because he was

"tired of … mentally dealing with it." ECF No. 302-1 at 98. He also testified that did not receive

any promises or consideration in exchange for providing information to the authorities. *Id*. at

109, 143. Detective Geary testified at trial he did not discuss with Woodall any criminal charges

that might be pending against him or his current probation situation. ECF No. 303-1 at 99-100.

Detective Thomas Dillard testified at trial that he did not offer Woodall any inducements to

provide information or promise Woodall any benefits in exchange for his testimony. *Id*. at 148.

He also denied that he had anything to do with Woodall not being charged in relation to Charles'

murder. ECF No. 303-2 at 7-8.

At the evidentiary hearing on Emil's 1992 state habeas petition, Chris Owens, a deputy

district attorney for Clark County, testified that he and Detective Geary visited Woodall in jail in

August 1985. ECF 153-10 at 7-8. According to Owens' testimony, Woodall indicated that he

wanted some consideration with respect to pending drug charges. *Id*. at 12. Owens promised

Woodall to provide such consideration if his information "checked out." *Id*. at 12-13. Ultimately,

Owens denied the drug charges against Woodall in exchange for the information Woodall

provided about Charles' murder. *Id*. at 8-10. Owens also notified Woodall's probation officer

about Woodall's cooperation. *Id*. Detective Dillard testified that he took over from Geary as the

lead detective on Emil's case in 1987. *Id*. at 32. He further testified that, subsequent to his initial

interview of Woodall, he submitted a document to the district attorney's office in December

1987 that included a hand-written notation requesting immunity for Woodall. *Id*. at 33-34.

Emil's claims that the State improperly suppressed favorable evidence were presented in

his initial state post-conviction proceeding. ECF No. 191-3 at 24-39. In affirming the state

district court's denial of relief, the Nevada Supreme Court correctly identified *Brady* as the

standard governing those claims. ECF No. 150-6 at 3-4. The court also concluded that "Emil has

demonstrated that the State failed to disclose two items of favorable impeachment evidence" –

(1) the prosecutor's denial of three drug-related charges in exchange for the information Woodall

provided the police in 1985 and (2) Dillard's request that Woodall be granted immunity when

Dillard submitted a form to the district attorney recommending that Woodall be charged as an

accessory to murder. *Id*. at 4. The court further concluded that the two items contradicted,

respectively, the trial testimony of Woodall and Dillard. *Id*.

The Nevada Supreme Court ultimately concluded, however, that Emil failed to

demonstrate that he was prejudiced by the State's failure to disclose evidence:

> The State does not appear to have treated the drug-related charges against
> Woodall as serious offenses. More importantly, denial of the charge request was
> not contingent on Woodall's agreement to testify against Emil. Similarly,
> impeachment of Detective Dillard on his immunity request for Woodall would
> have been of marginal value to the defense. There was little reason to connect
> Woodall with the crime in this case, absent the information he himself provided to
> the State. Further, Detective Dillard reiterated, at the post-conviction hearing, that
> Woodall did not request any benefits for his cooperation, nor did Dillard make
> any promises to Woodall to get him to cooperate.[8] Finally, we note that Woodall's
> testimony was in part corroborated by other physical and testimonial evidence.

_____

> [8]We recognize that Woodall did express concern to Dillard about
> being charged as an accessory.

*Id*. at 5.

Emil argues that the Nevada Supreme Court's determination that the suppressed evidence

was not material is both contrary to and an unreasonable application of federal law, as well as

based on an unreasonable determination of facts. He contends that the court's conclusion that

there is no reasonable probability of a different outcome had the jury heard the undisclosed

1 evidence was unreasonable given that Woodall was "the State's primary source of information,

2 their star witness at trial, and the only eyewitness connecting Emil to the murder of Charles

3 Emil." ECF No. 330 at 33.

4   Without question, disclosure of the agreement between Owens and Woodall would have

5 shown that Woodall was not telling the truth when he testified that he contacted the authorities

6 due to personal torment and that he was not given any promises or consideration in exchange for

7 providing information about the murder. Even so, this court is not convinced that the disclosure

8 would have caused the jury to discount Woodall's testimony about the murder. In addition to the

9 broken glass found at the location where Woodall said the murder occurred, the State presented

10 significant evidence to corroborate Woodall's version of the murder. The number of bullet

11 wounds to Charles' body matched the number of shots Woodall said Emil fired at Charles. ECF

12 No. 301-8 at 200-04. The caliber of the bullets used to kill Charles was consistent with the

13 caliber of the gun Woodall said Emil used. ECF No. 302-2 at 87- 88. A dried blood pattern

14 showing blood had been spattered from under the passenger door, back to the rear tire, and back

15 toward the front of the truck after hitting the tire substantiated Woodall's testimony that Emil

16 drove the pickup after shooting Charles. ECF No. 303-1 at 132. Woodall's testimony about Emil

17 telling him that $10,000 could be made if Charles was killed was corroborated by the testimony

18 of Koba, who did not know, and had never spoken with, Woodall. *Id*. at 62, 67.

19   Emil disputes the Nevada Supreme Court's finding that "[t]he State does not appear to

20 have treated the drug-related charges against Woodall as serious offenses." He does not explain,

21 however, how that would make a significant difference with respect to the credibility of

22 Woodall's testimony. Even if the drug charges were serious, seeking to have them dismissed

23 would not have been sufficient motivation for Woodall to fabricate information about (and

1  implicate himself in) Charles' murder when, at that point, the police had no reason to suspect he

2  was involved.

3      Emil also contends that the Nevada Supreme Court's finding that "denial of the charge

4  request was not contingent on Woodall's agreement to testify against Emil" is contradicted by

5  the record. He points to the transcript of the statement Woodall gave to Detective Geary in which

6  Woodall responded in the affirmative when asked whether he would be willing to testify in court

7  about what he had told the detective. ECF No. 330 at 36 (citing ECF No. 142-5 at 12). The

8  record does not, however, support a finding that Woodall had to testify to receive the

9  consideration promised by Owens. Owens testified at the state post-conviction hearing that he

10 did not discuss with Woodall any requirement that Woodall testify at trial. ECF No. 153-10 at

11 24. He also testified he and Geary visited Woodall around 2:00 pm on the day in question. ECF

12 No. 153-10 at 7-8. The transcript of Woodall's statement indicates that Geary did not take

13 Woodall's statement until close to 3:30 pm and that Owens was no longer present. ECF No. 142-

14 5. Thus, Woodall had already made his deal with Owens when he answered Geary's question

15 about testifying.

16     The record also supports the Nevada Supreme Court's conclusion that the "impeachment

17 of Detective Dillard on his immunity request for Woodall would have been of marginal value to

18 the defense." Disclosure of that information would not have provided effective impeachment

19 material with respect to Woodall. The request was submitted more than two weeks after Dillard

20 took Woodall's statement. *See* ECF No. 153-3. There is no indication in the record that Woodall

21 asked for consideration or was even aware of Dillard's request. The suggestion that Woodall

22 provided information in an effort to obtain immunity is questionable given that he was not facing

23 any charges when he gave his statement to Dillard and, according to Dillard's testimony, he

attempted to avoid Dillard rather than provide information. ECF No. ECF No. 303-2 at 6-7. As for impeaching Dillard with the information about the immunity request, Dillard's testimony contained little, if any, incriminating information that the police had not already obtained or that could not be corroborated by witnesses' statements or documentary evidence. ECF No. 303-1 at 142-59. In addition, defense counsel emphasized at trial the fact that Woodall was never charged even though Dillard prepared an affidavit requesting that he be charged as an accessory. ECF No. 303-2 at 7; ECF No. 304-1 at 83-84.

In sum, the Nevada Supreme Court's determination that there was no reasonable probability of a different outcome had the jury heard the undisclosed evidence was not unreasonable.

Emil also argues that he is entitled to relief under *Napue v. Illinois*, 360 U.S. 264 (1959), and that, because the Nevada Supreme Court did not adjudicate his *Napue* claim, this court must review it de novo, without applying AEDPA deference. In *Napue*, the U.S. Supreme Court held that "a conviction obtained through use of false evidence, known to be such by representatives of the State violates due process." 360 U.S. at 269. The Ninth Circuit has held that the *Napue* materiality standard is less demanding than *Brady*. *See Reis-Campos v. Biter*, 832 F.3d 968, 976 (9th Cir. 2016) (citing *Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008)).

Emil's de novo review argument fails for the simple reason that the Nevada Supreme Court did not have a *Napue* claim before it when it adjudicated Emil's *Brady* claim. Emil did not raise such a claim in his briefs on appeal. ECF No. 191-4; ECF No. 305-12. In fact, Emil's counsel, in her arguments to the state district court, explicitly confirmed that Emil was not alleging a *Napue* violation despite having cited the case in his post-conviction petition. *See* ECF No. 153-13 at 34 ("This is not a Napue versus Illinois violation where I'm alleging that the

1  prosecutor knowingly used false or perjure [*sic*] testimony and did nothing to correct it.") Thus,

2  to the extent Emil is asserting a claim under *Napue* in Ground 1B, that claim is unexhausted and

3  must be denied. *See* 28 U.S.C. § 2254(b)(1) (providing that an application for a writ of habeas

4  corpus "shall not be granted" unless "the applicant has exhausted the remedies available in the

5  courts of the State").

6      Claim 1B is denied.

7          *Claim 1D*

8      In Claim 1D, Emil alleges that the State suppressed blood-spatter evidence, which

9  prevented trial counsel from developing inconsistencies between the testimony of the State's

10  blood-spatter expert and the testimony of Frederick Woodall. At trial, the State presented the

11  testimony of Kathleen Adkins, an identification specialist with the Las Vegas Metropolitan

12  Police Department (LVMPD) who testified about the significance of blood patterns found on the

13  interior and exterior of Charles Emil's truck. ECF No. 303-1 at 22-33. Defense counsel began his

14  cross-examination of Adkins by asking her if she had prepared a written report. *Id*. at 133. When

15  she responded in the affirmative, counsel asked to approach the bench and was subsequently

16  granted a recess to review the report. *Id*. at 133-34.

17      Emil contends that, contrary to Adkins' testimony, the blood-spatter evidence does not

18  reveal how Charles was shot. He claims that the late disclosure of the report prevented defense

19  counsel from preparing a more thorough cross-examination of Adkins or enlisting the services of

20  their own blood-spatter expert to refute her findings. To support his claim, Emil proffers a report

21  prepared by Jerry Chisum, a crime scene specialist. ECF No. 181-2.

22      Emil insists that the testimony of his defense counsel at his state-post conviction hearing

23  establishes that the State improperly suppressed Adkins' report. This court agrees that the

1 testimony of both counsel supports a finding that neither of them had seen the report prior to

2 Adkins testifying. ECF No. 153-8 at 27-28, 49-50; ECF No. 153-9 at 27, 38. Their testimony is

3 less clear, however, as to whether the prosecutor withheld the report or whether counsel may

4 have overlooked it among the materials the prosecutor made available to them. ECF No.153-9 at

5 8-9, 37-38. It is also not clear that the report was "favorable" evidence that the State was obliged

6 to disclose. Arguably, the favorability of evidence for the purposes of *Brady* is determined by the

7 exculpatory or impeachment value of the evidence itself, not upon the potential use to which a

8 defendant may have eventually put it. *See U.S. v. Agurs*, 427 U.S. 97, 109–110 (1976)

9 (discussing absence of requirement of disclosure of all information, albeit in the context of

10 materiality); *Weatherford v. Bursey*, 429 U.S. 545 (1977) (finding no *Brady* violation despite

11 allegations that the disclosure of prosecution witness would have allowed a better opportunity to

12 prepare cross-examination of the witness).

13   In any case, Emil cannot meet the materiality standard. Addressing a claim that appellate

14 counsel was ineffective for failing raise the belated disclosure of the report as an issue on appeal,

15 the Nevada Supreme Court held:

16    Emil also claims that his appellate counsel was ineffective for failing to
raise a claim based the State's alleged untimely disclosure of a report on blood
17    splatter evidence prepared by an expert witness Kathleen Adkins. Appellate
counsel was not ineffective given trial counsel's failure to preserve the issue for
18    appeal and, thus, this issue is better considered as relating to the efficacy of
Emil's trial counsel. Further, Emil has not shown that trial counsel were
19    ineffective for failing to request additional time so that they could more
effectively cross-examine Adkins or produce an expert witness to dispute her
20    conclusions. Emil has failed to reveal serious error in Adkins' evaluation of the
evidence that might case doubt on eyewitness Frederick Woodall's testimony.

21

22 ECF No. 150-6 at 8. While the court applied the *Strickland* standard in concluding that Emil

23 failed to show prejudice, the same standard applies when assessing materiality under *Brady*. *See*

1  *United States v. Olsen*, 704 F.3d 1172, 1187 (9th Cir. 2013).

2      The Nevada Supreme Court's conclusion as to lack of prejudice was reasonable. There is

3  no dispute that Charles was shot four times while sitting in his truck. The Chisum report

4  establishes, at most, reasons to question Adkins' findings with respect to Charles' position and

5  movements when shot and how he may have been moved within the truck after being shot. ECF

6  No. 181-2 at 6-7. Even with his belated review of Adkins' report, defense counsel was able to

7  establish on cross-examination that the blood spatters found in the truck did not necessarily

8  confirm Woodall's statements about the movements of the victim's body. ECF No. 303-1 at 134-

9  42. Also, Chisum's report does not undermine, and appears to confirm, Adkins' most probative

10  finding – i.e., that the blood pattern on the side of the truck showed that the truck was moved

11  after Charles was shot. ECF No. 181-2 at 5; ECF No. 303-1 at 132.

12      Claim 1D is denied.

13          *Claim 1E*

14      In Claim 1E, Emil alleges that the State failed to disclose impeachment evidence about

15  Dona Kenny. Kenny and Woodall and their son lived together at the time of the murder. ECF

16  No. 302-2 at 17. Kenny testified that Emil and Carmack came over to her and Woodall's

17  apartment on the day of the murder. *Id*. at 18-19. She further testified that, after Woodall,

18  Carmack, and Emil went to the store together, the entire group, including her and her son, went

19  to a water park together in her and Woodall's truck and later returned to the apartment for a

20  barbeque. *Id*. at 20-22, 27. On cross-examination, Kenny admitted that she had been arrested on

21  drug charges in July 1985 for which she had not been prosecuted. *Id*. at 33. On re-direct, she

22  testified that she had not made any agreements with law enforcement regarding the drug charges.

23  *Id*. at 34.

Emil alleges that the State failed to disclose that, at the time Kenny testified, she had been charged with felony possession of cocaine and a bench warrant had been issued for her arrest. He further alleges that the State applied for, and received, a subpoena for Kenny that granted her immunity from arrest on criminal charges while she was in Nevada to testify.

The Nevada Supreme Court rejected Emil's *Brady* claim in relation to Kenny:

> We conclude that Emil's remaining claims, pursuant to *Brady*, also lack merit. The other alleged *Brady* material includes: (1) the circumstances of the arrest of witnesses Woodall and Dona Kenny on drug-related charges; (2) the fact that there were charges against Kenny pending at the time of trial; and (3) the transcript of a probation revocation hearing in Mineral County wherein Woodall admitted to probation violations. We note, however, that the defense was aware that Kenny and Woodall were arrested, at least at the time of trial. . . . Finally, we conclude that all of the aforementioned evidence fails the prejudice prong of *Brady*.

ECF No. 150-6 at 5-6 (footnote omitted).

Emil argues that the State had a duty to disclose the pending drug charges and arrest warrant even if defense counsel knew Kenny had been arrested. There is no evidence, however, that Kenny was given favorable treatment in exchange for her testimony. The subpoena requiring Kenny's appearance and testimony contained language protecting her from arrest, but that language appears to be boilerplate authorized by State law rather than evidence of an agreement between Kenny and the State. ECF No. 153-7 at 3-4; *see* Nev. Rev. Stat. § 174.435. More importantly, Emil fails to establish that the Nevada Supreme Court's lack of prejudice determination was unreasonable. As defense counsel noted in his post-conviction testimony, Kenny's testimony, in itself, was not "all that important." ECF No. 153-8 at 22-23. As for the suggestion that it may have shown Woodall was getting "an additional benefit from his statement" – i.e., getting the mother of his child out of her problem (ECF No.153-8 at 23), there is no evidence that such an arrangement existed, and Kenny was eventually prosecuted on the

1 drug charges. ECF No. 153-6 at 3.

2      Claim 1E is denied.

3           *Claim 1F*

4      In Claim 1F, Emil alleges that the Stated failed to disclose impeachment evidence that

5 Martin Koba was a paid jailhouse informant. As noted above, Koba testified that he overheard

6 Emil tell a few other people that "my mother hired my buddy and me to kill my stepfather." ECF

7 No. 303-1 at 62. He further testified that Emil said his mother did it "for the insurance money."

8 *Id*. at 62.

9      Emil claims that the State failed to disclose that Koba was a confidential informant in

10 connection with at least one other case. For supporting evidence, he points to Koba's statement

11 to the police about the Emil murder, which indicated that Koba had come to the LVMPD's

12 Detective Bureau to provide information on "an unrelated matter." ECF No. 151-5. He also

13 alleges that the State failed to disclose that Koba was paid $2,000 to testify for the prosecution.

14 He supports this allegation with a declaration from private investigator recounting his interview

15 with Koba in 2005. ECF No. 148-7.  Emil further claims that Koba had a "history of early

16 release from incarceration," which suggests that he was "a State informant for a number of

17 years." ECF No. 244 at 52-53.

18      The Nevada Supreme Court rejected Emil's *Brady* claim in relation to Koba:

19           Additionally, Emil complains that the State failed to disclose that witness
     Martin Koba was a confidential informant for the police. Emil's claim lacks merit.
20      Emil has failed to demonstrate that Koba was a confidential informant or that the
     prosecutor failed to disclose any pertinent information on this issue.

21

22 ECF No. 150-6 at 6 n. 9.

23      The Nevada Supreme Court's decision is well-supported by the record. Defense counsel's

testimony in Emil's post-conviction proceeding shows that counsel was provided with a copy of Koba's statement to the police. ECF No. 153-8 at 23. Counsel also testified that he recalled that Koba "was a snitch of some standing" and thought that the defense had "used that angle with him when he testified at trial." *Id.* at 24.

Emil's claim that Koba was a "paid" informant is problematic in at least two respects. First, neither the claim nor the evidence Emil uses to support it was presented to the Nevada Supreme Court when it rendered its decision. *See Pinholster*, 563 U.S. at 181 ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits.").

Second, even if Koba's statement to the investigator is to be believed, the $2,000 payment had minimal impeachment value. According to the statement, Koba did not want to come back to Las Vegas to testify at the trial because he had moved to Hawaii sometime after giving his statement to the police and was "making good money" when the State contacted him about testifying. ECF No. 148-7 at 2-3. Koba told the investigator that the State gave him the choice of either being subpoenaed or being paid $1,000. *Id.* at 3. Koba also told the investigator that he went directly to Secret Witness after testifying and they gave him $2,000 instead of $1,000. *Id.* Koba's testimony at trial was confined to the contents of, and did not deviate from, the statement he provided the police ten months earlier. ECF No. 151-5; ECF No. 303-1 at 59-68. Thus, the defense would not have been able to demonstrate that the payment Koba received influenced his testimony or undermined his credibility. Finally, Emil's claim that Koba had been "a State informant for a number of years" is speculative and not based on any evidence that the State had an obligation to disclose.

Claim 1F is denied.

**Ineffective Assistance of Counsel (IAC) Claims**

In Claims 1D1, 1G, 2B, 2D, 6, 9B, and 11B2, Emil raises claims that he received ineffective assistance of counsel in violation of his constitutional rights. To demonstrate ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments, a convicted defendant must show 1) that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all the circumstances of the particular case; and 2) that it is reasonably probable that, but for counsel's errors or omissions, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–94 (1984). "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*. at 697.

*Claim 1D1*

In Claim 1D1, Emil alleges trial counsel was ineffective for failing to consult with a crime scene expert and by failing to request a continuance of the trial upon learning about the nature of Adkins' testimony on blood-spatter evidence. Emil contends that effective counsel "would have explored the blood evidence from the crime scene pre-trial to determine if the evidence supported Woodall's story." ECF No. 244 at 49. He further contends that effective counsel would have asked for more than a ten-minute continuance when confronted with Adkins' testimony and her report.

For reasons discussed above in relation to Claim 1D, Emil cannot satisfy the *Strickland* prejudice prong for this claim. As noted, defense counsel was able to establish that the blood patterns found in the truck did not necessarily confirm Woodall's statements about the movements of the victim's body. ECF No. 303-1 at 134-42. However, the most salient facts

related to Adkins' testimony and the blood evidence are not subject to serious dispute, those being that Charles was shot while sitting in his pickup truck and that the truck was moved after Charles was shot. Emil has not demonstrated that counsel could have effectively challenged those facts if he had hired a crime scene expert or requested a longer continuance.

Claim 1D1 is denied.

### Claim 1G

In Claim 1G, Emil alleges that trial counsel provided ineffective assistance of counsel by failing to discover impeachment evidence regarding Woodall, Kenny, and Koba. Referring to evidence identified in his *Brady* claims, Emil alleges that "[t]rial counsel had an obligation to thoroughly investigate all of the State's witnesses for impeachment evidence, including deals made with law enforcement, benefits received from the State, prior relationships with law enforcement, and pending charges at the time of testimony." ECF No. 244 at 54.

The Nevada Supreme Court rejected Emil's claim that counsel was ineffective in failing to discover the *Brady* material:

> Emil claims that his trial counsel were ineffective for failing to independently discover some of the aforementioned alleged *Brady* material. We agree with the district court that Emil has not shown that his counsel was ineffective in this regard.

ECF No. 150-6 at 6. The state district court concluded that Emil had failed to meet either prong of the *Strickland* standard. ECF No. 191-3 at 85-87.

Emil argues that the Nevada Supreme Court unreasonably adopted the state district court's decision because the state district court applied the wrong prejudice standard under *Strickland* and failed to consider all the impeachment evidence related to Woodall, Kenny, and Koba. Even under de novo review, however, Emil's prejudice showing falls short. For reasons

explained in the discussion of Claims 1B, 1E, and 1F, above, there is not a reasonable probability that the outcome of Emil's trial would have been different had counsel discovered the alleged impeachment material prior to trial. *See Olsen*, 704 F.3d at 1187 ("If the withheld information does not constitute a *Brady* violation for lack of materiality, its absence likewise will not support an ineffective assistance of counsel claim.")

Claim 1G is denied.

*Claim 2B*

In Claim 2B, Emil alleges that his counsel was ineffective by failing to investigate Frederick Woodall's arrest records. He contends that, had counsel delved into Woodall's criminal history, he would have discovered that he had been arrested numerous times for various offenses as an adult and as a juvenile. He claims that counsel could have used this information to impeach his testimony and also call into question the police investigation that did not consider Woodall as a suspect.

At trial, Emil's counsel established on cross-examination that Woodall had been convicted of a felony and that he used an alias as a juvenile. ECF No. 302-1 at 110-11. Counsel also had Woodall confirm that he contacted the police while in custody due to problems with his probation and that his probation revocation involved a firearm charge. *Id*. at 121, 123-24.

Under Nevada law, only felonies are admissible for the purpose of attacking a witness's credibility, not mere arrests, convictions for misdemeanors, or juvenile adjudications. *See* Nev. Rev. Stat. § 50.095; *Sheriff, Washoe Cnty. v. Hawkins*, 752 P.2d 769, 773 (Nev. 1988). Emil appears to concede this point (ECF No. 244 at 57) but nonetheless fails to explain how counsel would have been able to present Woodall's arrest record under Nevada's rules of evidence, even for the purpose of challenging the police investigation. He does contend, for the first time, in his

reply that Woodall was convicted of an additional felony (ex-felon in possession of a firearm) that counsel failed to discover (ECF No. 330 at 89-90), but that one piece of information would not have made counsel's cross-examination appreciably more effective than it was. In sum, Emil is unable to show any prejudice arising from counsel's alleged failure to adequately delve into Woodall's criminal history.

Claim 2B is denied.

*Claim 2D*

In Claim 2D, Emil alleges that his counsel was ineffective by failing to investigate the circumstances of Woodall's probation violation. With respect to his probation status when he first contacted law enforcement, Woodall testified on cross-examination that: "I had myself revocated (sic), to do the sentence." ECF No. 312-1 at 123-24.  When asked to explain on redirect examination, he testified that he had "asked the judge to let me do the time." *Id*. at 142. According to Emil, "[t]he transcript of the revocation hearing does not contain any request by Woodall to be revoked or to serve time" and shows that he "lied to the jury about his probation revocation proceedings." ECF No. 244 at 60. He claims that "trial counsel missed the opportunity to confront him with this fact because they failed to reasonably investigate him." *Id.*

The parole revocation involved a case in which Woodall had pleaded guilty to carrying a concealed weapon, a gross misdemeanor, and given a one-year suspended sentence with two years of probation. ECF No. 143-3 at 12-14. At the revocation hearing that Emil refers to as support this claim, Woodall's probation was being revoked for changing his residence without permission and failing to appear at a prior revocation hearing. ECF No. 143-6 at 11-12; ECF No. 143-7 at 4. When asked by the judge whether he intended to admit or deny the allegations in the revocation petition, Woodall's attorney responded that Woodall "would admit with an

explanation as to the circumstances." ECF No. 143-7 at 4. Woodall then told the judge about having witnessed a murder a week before he was supposed to appear in court the year before and having to leave because he and his family had been threatened. *Id*. at 4-6. Woodall's attorney conceded that judgment should be entered and informed court of Woodall's desire to serve out his time in Mineral County. *Id*. at 6.

The court is not convinced that counsel's cross-examination of Woodall would have been significantly more effective had counsel obtained the transcript of the revocation hearing. Citing several instances of Woodall being arrested while on probation, Emil argues that Woodall's testimony about conceding revocation was disingenuous because revocation was a foregone conclusion.  As noted above, however, arrests that did not result in a felony conviction were not admissible impeachment evidence. The transcript shows, at most, that Woodall's trial testimony on a relatively unimportant point was not completely accurate. There is not a reasonable probability that the jury would have reached a different verdict if counsel had confronted Woodall with the transcript.

Claim 2D is denied.

*Claim 6*

In Claim 6, Emil alleges that his counsel was ineffective for failing to reasonably investigate or offer evidence regarding the remuneration aggravating circumstance.[2] At trial, Woodall testified that Emil had told him "[t]hat $10,000.00 could be made by the death of his

---

[2] The jury found two aggravating circumstances to support the death penalty: (1) the murder was committed by a person who was previously convicted of another murder; and (2) the murder was committed by a person, for himself of another, for the purposed of receiving money or any other thing of monetary value. ECF No. 305-15 at 2.

stepfather." ECF No. 302-1 at 89.[3] Koba testified that he overheard Emil telling others that he received money from his mother for killing his stepfather. ECF No. 303-1 at 62 and 65. Bertha Goodwin, the office manager of Charles' union, testified that Mary Deitrich, Emil's mother and Charles' wife, received approximately $38,000 in benefits as a result of Charles' death. ECF No. 302-2 at 72-77. Pamela Gonzalez testified that Emil and her husband, Dan Gonzalez, approached her about being the treasurer for a painting and landscaping business they were starting. *Id*. at 9-10. She further testified that the only work she did for the business was to cash a check for $7,600 that Emil gave her, the proceeds of which she immediately gave to Emil. *Id*. at 12-17.

To counter this evidence, Emil's counsel presented testimony from Deitrich that the money she gave Emil was a loan for him to start a landscaping and painting business. ECF No. 303-2 at 72-87. Deitrich also testified that a reason she loaned money to Emil was that she felt he deserved it because, due to the death of Emil's father, she had for several years received benefits for Emil from Social Security and the State of Colorado. ECF No. 304-1 at 15-16. Defense counsel also presented the testimony from Deitrich's sister, Lynn Teed, that Deitrich was not aware of the union benefits until after Charles was killed. ECF No. 304-2 at 76-77.

Emil claims that counsel was ineffective for not locating and presenting records from the Social Security Administration or the State of Colorado to support Deitrich's testimony. According to Emil, those records would have shown that Deitrich had received at least $7,600 in payments from those sources. Emil also contends that counsel should have presented additional testimony from Lynn Teed and also should have called Dan Gonzalez as a witness to support the

---

[3] Woodall initially testified that he was "not positive" whether Emil had told him that Emil's mother was going to pay Emil for killing his stepfather. *Id*. at 102. When confronted with the statements he gave the police in August 1985, Woodall confirmed that he had told the police that Emil "had said that his mother was willing to give him $10,000 for the murder of Mr. Emil." *Id*. at 102-08.

defense's claim that the $7,600 was merely a loan for Emil to start a business.

The Nevada Supreme Court rejected Emil's claim that counsel was ineffective in failing to challenge the  remuneration aggravating circumstance:

> Emil claims that his trial counsel failed to effectively defend him on the aggravating circumstance allegation that the murder was committed for pecuniary gain. Specifically, Emil complains that counsel did not introduce evidence to corroborate the assertions of his mother, Mary Deitrich, regarding her financial status and motives. We conclude that Emil has failed to demonstrate that his trial counsel were ineffective in this regard.
>
> Ultimately, the most important financial information was undisputed. There was no dispute that Deitrich had substantial savings in *joint* accounts with the victim; the prosecutor referred to this fact in closing argument. Deitrich loaned or gave Emil $7,600 shortly after the murder. Further Deitrich received a large amount of money in insurance and other benefits from the death of the victim. It was these facts, coupled with admissions that Emil made to other witnesses about the murder that led the prosecutor to argue, in the penalty phase, that Emil was motivated by pecuniary gain.

ECF No. 150-6 at 7-8 (emphasis in original).

Emil fails to establish that this decision is not entitled to deference under § 2254(d). In addition to the benefits from the union, Detective Dillard testified that Deitrich had told him that she and Charles Emil had over $20,000 in joint accounts, a fact that Deitrich did not dispute on cross-examination. ECF No. 304-1 at 10-11, 23. There is no indication that the jury did not believe Deitrich's testimony regarding the benefits she received from Social Security or the State of Colorado. Likewise, the jury likely believed that Emil used the money Deitrich gave him for his painting and landscaping business. The evidence still showed that Deitrich gave Emil $7,600 soon after Charles was killed and that, but for Charles' death, that would not have occurred. Added to that are the testimony of Woodall and Koba on the subject. In sum, the Nevada Supreme Court's rejection of this claim was not an objectively unreasonable application of Strickland, nor was it based on an unreasonable determination of the facts.

24

1    Claim 6 is denied.

2         *Claim 9B*

3         In Claim 9B, Emil alleges three ways in which his counsel was ineffective in relation to

4    the jury instructions that were used at his trial. First, he claims counsel was ineffective for failing

5    to object to the jury instruction on the definition of malice, which he claims impermissibly

6    shifted the burden of proof. Second, he claims counsel was ineffective for failing to object to the

7    reasonable doubt instruction. Third, he claims counsel was ineffective for failing to object to

8    penalty phase instructions that misled the jury into believing that they must find mitigating

9    circumstances unanimously.

10        The Nevada Supreme Court addressed this claim in Emil's state post-conviction

11   proceeding. Citing prior reported decisions addressing each of the alleged instructional errors,

12   the court concluded that Emil had "failed to demonstrate that counsel were ineffective because

13   the jury instructions were not inappropriate." ECF No. 150-6 at 7. For the reasons that follow,

14   the court did not unreasonably apply federal law in reaching that conclusion.

15        With respect to the malice instruction, Emil claims an instruction to the jury that malice

16   shall be implied when there is an absence of provocation is inconsistent with the presumption of

17   innocence instruction. According to Emil, the jurors must be presumed to have followed the

18   erroneous instruction. Thus, the jurors would have implied malice from the lack of proof of

19   provocation, which placed the burden on Emil to prove provocation in order for the jury to not

20   find malice.

21        There were several instructions pertinent to this issue in Emil's case:

22        Instruction No. 4:

23   Murder is the unlawful killing of a human being, with malice aforethought, either
     express or implied. The unlawful killing may be effected by any of the various

25

means by which death may be occasioned.

Instruction No. 6:

Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof.

Malice shall be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart.

Instruction No. 7:

Murder of the First-Degree is the willful, deliberate and premeditated killing of another human being.

Instruction 13:

The offense of First Degree Murder necessarily includes the lesser offense of Second Degree Murder.

If you are convinced beyond a reasonable doubt that the crime of murder has been committed by a defendant, but you have a reasonable doubt whether such murder was of the first or of the second degree, you must give the defendant the benefit of that doubt and return a verdict of murder of the second degree.

Instruction 14:

Murder of the Second Degree is murder with malice aforethought, but without premeditation.

All murder which is not Murder of the First Degree is Murder of the Second Degree.

ECF No. 151-8 at 5,7,8, 14, and 15.

The jury instructions contained no other basis for the jury to find Emil guilty of first-degree murder. Thus, based on these instructions, the jury's verdict of first degree murder necessarily required the jury to find that the killing was "willful, deliberate and premeditated," which means that the jury found express malice. Accordingly, Emil cannot establish a reasonable probability that, but for counsel's alleged failure to object to implied malice instruction, the

1  outcome of his case would have been different.

2      The reasonable doubt instruction that Emil claims violated his right to due process read as

3  follows:

> 4  A reasonable doubt is one based on reason. It is not mere possible doubt, but is
> such a doubt as would govern or control a person in the more weighty affairs of
> 5  life. If the minds of the jurors, after the entire comparison and consideration of all
> the evidence, are in such a condition that they can say they feel an abiding
> 6  conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be
> reasonable must be actual and substantial, not merely possibility or speculation.
> 7

8  ECF No. 151-8 at 19, ECF No. 153-12 at 12.

9      This instruction is exactly the same as the instruction that the Ninth Circuit has

10  determined to be constitutional. *Ramirez v. Hatcher*, 136 F.3d 1209, 1211–15 (9th Cir. 1998);

11  *see also Nevius v. McDaniel*, 218 F.3d 940, 944–45 (9th Cir. 2000). Thus, the Nevada Supreme

12  Court reasonably applied *Strickland* when it determined that the lack of objection to the

13  reasonable doubt instruction was not ineffective assistance of counsel.

14      Lastly, Emil claims counsel provided ineffective assistance of counsel by failing to

15  challenge jury instructions that, according to Emil, misled the jury into believing that mitigating

16  circumstances had to be found unanimously. Emil argues that the instructions, together with a

17  special verdict form provided to the jury, were misleading in the same manner as the instructions

18  and verdict form in *Mills v. Maryland*, 486 U.S. 367 (1988).

19      The Supreme Court in *Mills* vacated the petitioner's death sentence after "conclud[ing]

20  that there is a substantial probability that reasonable jurors, upon receiving the judge's

21  instructions in this case, and in attempting to complete the verdict form as instructed, well may

22  have thought they were precluded from considering any mitigating evidence unless all 12 jurors

23  agreed on the existence of a particular such circumstance." *Mills*, 486 U.S. at 384. In *Howard v.*

1  *Gittere*, 392 F. Supp. 3d 1205 (D. Nev. 2019), this court confronted an IAC claim based on,

2  essentially, the same allegations and jury instructions. As explained in that case, the offending

3  instructions and verdict form in *Mills* stated, or at least strongly implied, that the jury must

4  determine the existence of a mitigating factor unanimously. *Howard*, 392 F. Supp. 3d at 1222-

5  23.  Noting that the instructions and verdict form in Howard's case did not impose a similar

6  requirement, the court concluded that counsel was not ineffective for failing to challenge them

7  because, unlike in *Mills*, there was "not 'a substantial possibility' that reasonable jurors would

8  have construed the instructions and form to preclude them from considering any mitigating

9  evidence unless they all agreed on the existence of a mitigating circumstance." *Id.* at 1223 (citing

10  *Mills*, 486 U.S. at 384). The same reasoning applies in this case, so the Nevada Supreme Court's

11  denial of the claim was a reasonable application of *Strickland*.

12          Claim 9B is denied.

13                  *Claim 11B2*

14          In Claim 11B2, Emil claims counsel provided ineffective assistance by not objecting to

15  incomplete instructions regarding his failure to testify or requesting clarifying instructions that

16  his failure to testify could not be held against him.  The trial court's only instruction to the jury

17  on that issue was that the "[i]n accordance with a right guaranteed by the constitution, no person

18  can be compelled, in a criminal action, to be a witness against himself." ECF No. 151-8 at 20.

19  Emil contends that counsel should have requested an instruction informing the jury that they

20  could not make any presumption or draw any inference based on Emil's failure to testify.

21          This claim fails. Emil cites no legal authority establishing that counsel's failure to object

22  or request an additional instruction fell below reasonable professional standards. Counsel may

23  have decided that an additional instruction would only highlight Emil's failure to testify. Even if

counsel did not make a reasonable strategic decision, Emil also fails to show that there is a

reasonable probability of a different outcome if the jury had been provided the additional

instruction. The only evidence he proffers to support prejudice are statements from a couple of

jurors indicating that Emil's silence during the guilt phase was held against him during jury

deliberation. ECF No. 244 at 166 (citing ECF Nos. 148-9  and 149-6). These statements,

contained in declarations executed nearly 20 years after Emil's trial, relate to the internal

deliberative processes that led to the jury's verdict, so they are not admissible for the purposes of

challenging the validity of the verdict. *See* Fed. R. Evid. 606(b)(1) ("The court may not receive

... evidence of a juror's statement on these matters."). In addition, they are beyond the court's

consideration because Emil failed to develop this evidence in state court in the manner

prescribed by state law. *See* 28 U.S.C. § 2254(e)(2); *Emil v. Taylor*, 529 U.S. 420, 432 (2000)

(discussing the diligence required to avoid the restriction on new evidence imposed by

§ 2254(e)(2)).

Claim 11B2 is denied.

**Prosecutorial Misconduct Claims**

In Claims 5B, 5E, 5F, and 5G, Emil alleges that he is entitled to habeas relief due to

prosecutorial misconduct. A defendant's due process rights are violated when a prosecutor's

misconduct renders a trial fundamentally unfair. *Darden v. Wainwright*, 477 U.S. 168, 181

(1986). "On habeas review, constitutional errors of the 'trial type,' including prosecutorial

misconduct, warrant relief only if they 'had substantial and injurious effect or influence in

determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting

*Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)).

\ \ \

1        *Claim 5B*

2            In Claim 5B, Emil alleges that the prosecutor improperly bolstered the credibility of

3    witnesses during the testimony of Woodall, Detective Dillard, and Koba.[4] With respect to

4    Woodall, Emil claims the prosecutor did this by soliciting testimony about what prompted

5    Woodall to contact law enforcement a year after the murder and by introducing Woodall's prior

6    statement that Emil "mentioned his mother and money she was going to pay him for killing his

7    stepfather." ECF No. 330 at 105 (citing ECF No. 302-1 at 103.) With respect to Detective

8    Dillard, he cites to instances of the prosecutor eliciting testimony concerning (1) prior consistent

9    statements made by Woodal about how the victim's body moved when it was shot and how to

10   launder money and (2) a statement by Pamela Gonzalez about Emil's mother being present when

11   Pamela cashed the check for Emil. *Id*. at 105-06 (citing ECF No. 303-1 at 146-53). For Koba, he

12   refers to the prosecutor showing Koba a transcript of his statement to Detective Dillard and

13   asking him to confirm that he told the detective: "All Rodney said was, 'Me and another guy

14   bumped off my stepfather for my mother, so she could get the insurance' that was the thing, the

15   way I remember it." *Id*. at 106 (citing ECF No. 303-1 at 66-67.)

16           Emil's allegations in Ground 5B amount to, at most, the admission of testimony subject

17   to an objection based on the rules of evidence. *See Tome v. United States*, 513 U.S. 150, 156

18   (1995) ("Rule 801 defines prior consistent statements as nonhearsay only if they are offered to

19   rebut a charge of 'recent fabrication or improper influence or motive.' Fed. Rule Evid.

20   801(d)(1)(B)."). Absent from the state court record is any indication that the prosecutor's

21   solicitation of the testimony at issue remotely approached the type of misconduct that provides a

22

23   _____

[4] The claim also includes Detective Geary on this list but does not cite to any examples in the
record.

basis for habeas relief. *See Darden*, 477 U.S. 181–82 (describing the type of misconduct that may deprive a defendant of a fair trial).

Claim 5B is denied.

### *Claim 5E*

In Claim 5E, Emil alleges that the prosecutor discussed the murder of Ross Tolley in a manner that was designed to inflame the jury and not relevant to Emil's character or background.[5] Emil cites to the prosecutor's presentation of evidence related to the murder and the following comments:

> Ross Tolley, who was in his early 20's, who had lived for a short time in [the] community, and who obviously had shortcomings like we all do, but was entitled to live out his life.
> . . . .
>
> Rodney Emil was convicted of murder of the first degree with the use of a firearm of Ross Duane Tolley, bludgeoned in his head by some blunt instrument consistent with a baseball bat or hammer. And you can look, as you have already done, at the one photograph, after the hair was shaved back, which shows the head, and you can see the ferocity of those blows which undoubtably disarmed Ross Tolley.
> . . . .
>
> You can see evidence of the vehicle, evidence on the body of what occurred. The murder of Ross Tolley was suspicious. It was brutal. There can be no justification for the murder of a 21 or 22 year old man.

ECF No. 244 (citing ECF No. 304-2 at 155-56).

On direct appeal, the Nevada Supreme Court determined that the trial court erred in allowing the State to present certain evidence related to the Tolley murder but that the error was harmless:

> We note … that the lower court erred in admitting three particular items of evidence, over Emil's objection, concerning the prior murder conviction. First,

---

[5] Claim 5E also alleges that the prosecutor improperly commented on Emil's exercise of his right to remain silent, but that portion of the claim is procedurally defaulted. ECF No. 287 at 18, 21.

admission of the autopsy photographs taken of the victim's body after it had been bludgeoned about the head, shot, partially burned and left in the trunk of a car for several days; second, evidence of the discernible odor coming from the car where the body was found; and finally, the testimony of the victim's former roommate that the victim was a "nice guy." Although a trial court may admit evidence or testimony of the facts and circumstances concerning a prior murder conviction, such evidence or testimony must be helpful in assessing the defendant's character and determining the proper punishment. It may not be admitted to essentially and primarily inflame and agitate the jury. The aforementioned evidence of that basic nature and purpose. However, we have determined that the error in admitting the referenced evidence was harmless beyond a reasonable doubt. The evidence of aggravation so clearly outweighed that of mitigation that the error did not impair the jury's function in determining Emil's punishment.

*Emil*, 784 P.2d at 961. The court also concluded that the comments excerpted above were not improper:

We hold that the prosecutor was not impermissibly attempting to inflame the jury with passion or prejudice in the penalty hearing. Rather, the prosecutor was simply drawing inferences concerning Emil's character based upon the record evidence. Details of prior crimes and a defendant's character are relevant factors to be considered by a jury in imposing a penalty in a capital case.

*Id*. at 962.

Emil argues that the state court's decision was contrary to clearly established federal law because it relied upon a sufficiency of the evidence analysis in determining that the admission of improper evidence was harmless error. This argument is without merit because the Nevada Supreme Court did no such thing. A sufficiency of the evidence analysis requires a court to decide "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original). Here, there is no indication that the Nevada Supreme Court either viewed the evidence in the light most favorable to the prosecution or considered the evidence from the perspective of any rational trier of fact. Instead, the court determined that the aggravating evidence was so weighty as compared

to the mitigating evidence that the admission of improper evidence "did not impair the jury's function in determining Emil's punishment." *Emil*, 784 P.2d at 961. Indeed, the standard the state court imposed (i.e., "harmless beyond the reasonable doubt") is a lower standard for reversal than the *Brecht* test that applies on federal habeas review. *See Davis v. Ayala*, 576 U.S. 257, 267–68 (2015).

With respect to the determination that the prosecutor's comments were not improper, Emil argues that the Nevada Supreme Court was unreasonable in focusing on the prosecutor's intent, rather than on the fairness of the trial. Implicit in the state court's holding, however, is that the comments did not impact the fairness of the trial because they were not improper. And, even if the remarks were improper, they do not provide grounds for habeas relief unless they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181. This inquiry requires the court to consider the prosecutor's actions in the context of the entire proceedings. *Boyde v. California*, 494 U.S. 370, 384–85 (1990); *Darden*, 477 U.S. at 179. Viewed in this manner, the prosecutor's references to Tolley's age and the condition of his body did not deprive Emil of a fair trial.

Claim 5E is denied.

*Claim 5F*

In Claim 5F, Emil alleges that the prosecutor improperly misled the jury by arguing that it could not consider his youth as a mitigating circumstance. Emil cites to the following comments during the State's rebuttal closing argument:

> Number Six, the youth of the Defendant at the time of the crime. Well, when you are my age, 23 is young. However, I wonder if the legislature contemplated 23 years of age, a person who had been on his own since he was 14 or 15, as being youthful. Mr. Schieck says he was a young 23. On the contrary, when we hear what happened to Mr. Emil, I argue he was an old 23, and if we're talking about a 14 or 15 year old boy, if we were talking about Mr. Emil committing this crime

shortly after his stepfather disowned him and forced him to leave the family home, then I could appreciate it that the conduct may have been a reaction to what occurred by an immature, youthful mind. We wouldn't justify it –

[Defense objection noting minimum age for capital punishment]

Well, it's true you have to be 16 or older, that wasn't the point at all. I'm saying 14 or 15 is young. 14 or 15 is a situation where we would say, 'Yes, you mitigate, perhaps you're lenient, perhaps you give him life with parole.' We're talking about a 23 year old man, a 23 year old man who had the maturity to procure a firearm, who obviously reloaded the firearm, who then orchestrated a situation where he was taken to a scene, knowing his stepfather would be there, who had a partner pull up to where he would be even with the cab, and began to fire.

ECF No. 304-2 at 175-77. According to Emil, the State violated Emil's Eighth Amendment right to individualized sentencing determinations in capital cases by asking jurors to disregard Emil's youth, a statutory mitigating factor.

On direct appeal, the Nevada Supreme Court rejected Emil's argument that the prosecutor's argument was grounds for reversal:

The comments regarding Emil's youth … do not rise to the level of prosecutorial misconduct. Clearly, the youth of the defendant at the time of the commission of a crime is a mitigating circumstance in a capital murder case. *See* NRS 200.035(6). The challenged exchange suggests that the defense was hoping to establish youth as a mitigating factor by characterizing Emil as a "young" twenty-three year old. The State merely countered defense counsel's portrayal by suggesting that Emil was in fact "old" for his age, and by pointing out that the mitigating circumstance contemplated by NRS 200.035(6) is an age younger than twenty-three. In short, defense counsel invited the State's remarks concerning Emil's age and it was not error to permit the prosecutor to so respond.

*Emil*, 784 P.2d at 962.

The Nevada Supreme Court's rejection of Claim 5F was not an objectively unreasonable application of federal law. Despite Emil's argument suggesting otherwise, the State did not

1  eliminate the youth of the defendant as a mitigating factor for the jury to consider.[6] The

2  prosecutor did not argue that the jury could not consider the factor. Instead, he argued that the

3  facts did not support the factor in Emil's case. While the argument was marginally misleading

4  because a 14 or 15 year old would not be subject to the death penalty, defense counsel brought

5  that to the jury's attention with his objection.  The state court's decision that the argument did

6  not warrant reversal is entitled to deference under § 2254(d).

7          Claim 5F is denied.

8              *Claim 5G*

9          In Claim 5G, Emil alleges that prosecutorial misconduct at his trial, when considered

10  cumulatively, warrants habeas relief. Even when separately alleged incidents of prosecutorial

11  misconduct do not independently rise to the level of reversible error, "[t]he cumulative effect of

12  multiple errors can violate due process." *United States v. Nobari*, 574 F.3d 1065, 1082 (9th

13  Cir.2009) (internal quotation marks omitted). Emil cites the various instances of alleged

14  misconduct alleged throughout his petition.

15         As discussed in this order, the few instances of misconduct that did occur were only

16  marginally prejudicial. The balance of evidence weighed heavily in favor of both the guilt and

17  death penalty verdicts. This court concludes that prosecutorial misconduct did not infect the trial

18  with such unfairness as to make the resulting conviction or sentence a denial of due process. *See,*

19  *e.g., Wood*, 693 F.3d at 1116-17 (holding allegations of prosecutorial misconduct did not "rise to

20  the level of a due process violation even when considered in the aggregate").

21         Claim 5G is denied.

22

23
_____

[6] The jury instructions provided that that jury could consider the youth of the defendant at the
time of the crime as a mitigating circumstance. ECF No. 153-12 at 13.

**Sufficiency of the Evidence Claim**

*Claim 10B1*

In Claim 10B1, Emil alleges that his conviction violates his constitutional rights because there was insufficient evidence presented at his trial to prove his guilt beyond a reasonable doubt. Emil argues that the testimony of Charles' wife and daughter showed that Charles was still alive more than two hours after the time Woodall, the State's only eye-witness, testified the murder occurred. Emil also argues that, for various reasons, Woodall's testimony that Emil told him that $10,000 could be earned from the death of his stepfather did not support a finding that Emil intentionally caused Charles' death.

On direct appeal, the Nevada Supreme Court rejected Emil's sufficiency of the evidence claim:

> Emil next argues that the evidence adduced at trial was insufficient as a matter of law to establish his guilt beyond a reasonable doubt. In reviewing trial evidence, the question is not whether this court is convinced of a defendant's guilt beyond a reasonable doubt, but whether the jury, acting reasonably, could have been convinced to that certitude by the evidence it had a right to consider. *Wilkins v. State*, 96 Nev. 367, 609 P.2d 309 (1980).

> Based on the foregoing standard and the evidence in this case, the jury reasonably could have found Emil guilty of first degree murder with use of a deadly weapon. First, Frederick Woodall testified that on June 17, 1984, he saw Emil fire at the victim three or four times with a revolver. Woodall further stated that the passenger window of the truck occupied by the victim was shattered by the gunshots and that the victim fell onto the floorboard. Woodall's observations were consistent with the police and autopsy reports.

> Second, Detective Geary of the Las Vegas Metropolitan Police Department testified that Woodall directed him to the murder site which was due south of the place where Charles Emil's truck and dead body were discovered. At the murder site identified by Woodall, Detective Geary discovered fragments of broken automotive glass which corroborated the testimony explaining why no glass fragments were found next to the vehicle where it was first discovered by the police.

> Third, Woodall stated that on the day of the murder, Emil told him that he

36

needed to call his stepfather and that he later observed Emil making a call from a public telephone shortly before he, Carmack and Emil met the victim's vehicle.

Fourth, Woodall testified that two or three weeks before the shooting Emil told him that it would be financially beneficial for Emil to kill his stepfather. Woodall also stated that on the day the victim was buried, Emil boasted that he was a good shot, having hit his stepfather three times in the heart and once in the brain.

Fifth, as previously noted, Martin Koba, one of Emil's associates, testified to overhearing someone whose voice sounded like Emil's state that he had been hired to kill his stepfather.

The foregoing notwithstanding, Emil correctly points out that there are time discrepancies in Woodall's testimony relating to the day of the murder. Hence, Emil argues that his conviction should be overturned for want of sufficient evidence. Woodall explained, however, that he was not wearing a watch on the day of the murder and had no reason to pay particular attention to the time. Furthermore, discrepancies in testimony are relevant to the witness' credibility, a matter left to the jury. *Ward v. State*, 95 Nev. 431, 596 P.2d 219 (1979). On appeal, this court will not overturn a verdict because of inconsistencies already resolved by the jury as the trier of fact. *Id.*, 95 Nev. 431, 596 P.2d at 221.

*Emil*, 784 P.2d at 959.

As noted above, the question presented with a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in the original). Thus, the Nevada Supreme Court applied to correct federal law standard. *See Wilkins*, 609 P.2d at 313 (citing *Jackson* as a source in deciding a sufficiency of the evidence claim). Also, under AEDPA, "there is a double dose of deference that can rarely be surmounted." *Boyer v. Belleque*, 659 F.3d 957, 964 (9th Cir. 2011); *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (explaining that sufficiency claims "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference"). "[T]o grant relief, [the Court] must conclude that the state court's determination that a rational jury

could have found that there was sufficient evidence of guilt, i.e., that each required element was proven beyond a reasonable doubt, was objectively unreasonable." *Boyer*, 659 F.3d at 965.

Emil's arguments regarding the sufficiency of the evidence fall well short of establishing grounds for habeas relief. Defense counsel emphasized to the jury that Woodall's testimony regarding the time of the murder was contradicted by testimony showing that Charles was still alive hours later. ECF No. 304-1 at 68-70. Even so, the jury was convinced that Emil committed the murder. This court "must respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted). Even if only a portion Woodall's "contradicting and inconsistent" testimony provides a sufficient basis for a rational trier of fact to find Emil guilty beyond a reasonable doubt, then this court must assume that the jury "resolved ... conflicts of evidence in favor of the prosecution's factual theory" and find sufficient evidence to uphold the jury's verdict. *See United States v. Loya*, 807 F.2d 1483, 1489 (9th Cir.1987); *Jackson*, 443 U.S. at 326.

Likewise, this court agrees with Emil that Woodall's testimony about Emil mentioning the $10,000 to be gained by Charles' death is not, in and of itself, sufficient to prove Emil was guilty of first-degree murder. When considered with the rest of the evidence, however, the jury had ample evidence before it to find the essential elements of first-degree murder beyond a reasonable doubt. In sum, the Nevada Supreme Court's rejection of Emil's sufficiency of the evidence claim was not contrary to, or an unreasonable application of, clearly established federal law and was not based on an unreasonable determination of the facts.

Claim 10B1 is denied.

**Trial Court Error Claims**

*Claim 3*

In Claim 3, Emil alleges that his constitutional rights were violated when the trial court refused to admit the results of Woodall's polygraph examination. The examination was administered in December 1987 and indicated that Woodall was being deceptive in answering some questions about the murder. ECF No. 142-8. During the penalty phase, Emil's counsel notified the court that he intended to present the results by calling as a witness the detective who administered the examination. ECF No. 304-2 at 14-15. He argued that the results should be admitted under the more relaxed evidentiary standards applicable to penalty hearings because his client was facing the death penalty. *Id*. Finding that the results were not competent evidence, the trial court refused to allow counsel to present them. *Id*. at 16.

Emil contends that his rights under the Eighth and Fourteenth Amendments were violated because the trial court's exclusion of the polygraph evidence precluded the jury from considering mitigating evidence related to the circumstances of the offense.  The Eighth Amendment calls for heightened reliability in capital sentencing proceedings, which is accomplished by admitting sufficient information about the defendant and the offense such that the sentencer may render an individualized sentencing determination. *See Woodson v. North Carolina*, 428 U.S. 280, 304 (1976). Accordingly, the Eighth Amendment guarantees a capital defendant's right to present relevant mitigating information to the sentencer. *See, e.g., Lockett v. Ohio*, 438 U.S. 586, 608 (1978). However, "[t]he Eighth Amendment does not establish a federal code of evidence to supersede state evidentiary rules in capital sentencing proceedings." *Romano v. Oklahoma*, 512 U.S. 1, 12 (1994). The sentencing court may exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense. *See Lockett*, 438 U.S. at

1   604 n. 12.

2        In deciding Emil's direct appeal, the Nevada Supreme Court addressed the admissibility

3   of the polygraph examination as follows:

4            Emil contends that a polygraph exam taken by Woodall and ruled by the
         trial judge to be incompetent and inadmissible, should have been admitted during
5        the penalty phase of his trial. Emil argues that this evidence would have gone to
         mitigation because Woodall allegedly failed the polygraph exam.

6

7            According to statute, questions concerning the admissibility of evidence
         during the penalty phase of a capital murder trial are generally left to the trial
         judge's discretion. NRS 175.522. *See Milligan v. State*, 101 Nev. 627, 708 P.2d
8        289 (1985). Although this court has never ruled on the admissibility of polygraph
         test results at a penalty hearing, such results are admissible at the guilt phase of
9        trial only if both parties have signed a written stipulation to that effect. *Santillanes
         v. State*, 102 Nev. 48, 714 P.2d 184 (1986).

10

11           In the instant case, Woodall's polygraph examination results were not
         admissible at the guilt phase of trial because the parties did not stipulate to their
12       admission. The test results did not come in at Emil's penalty hearing for the same
         reason. This was a correct ruling by the trial judge. If polygraph results were
13       available to defendants when deemed to be favorable to their cause, an equal
         entitlement should be accorded the prosecutor when favorable to the State's case.
14       We are not persuaded that the degree of reliability of such examinations warrants
         a unilateral right of admissibility in the penalty phase of a capital case. Therefore,
15       Woodall's polygraph examination results were properly excluded.

16   *Emil v. State*, 105 Nev. 858, 864, 784 P.2d 956, 960 (1989)

17       Emil argues that the Nevada Supreme Court's decision was an unreasonable because it

18   "excluded the sort of powerful 'lingering' or 'residual doubt' evidence that the Supreme Court

19   has described as an 'extremely effective argument' for defendants in the sentencing phase of a

20   capital case." ECF No. 330 at 102 (citing *Lockhart v. McCree*, 476 U.S. 162, 181 (1986)). While

21   raising a doubt about Emil's guilt or relative guilt would have improved his chances of avoiding

22   the death penalty, this court is not convinced that Emil had a constitutional right to present the

23   polygraph evidence at the penalty hearing. In concluding that a per se rule against the admission

1  of polygraph evidence in court martial proceedings did not violate a defendant's Fifth or Sixth

2  Amendment right to present a defense, the Supreme Court noted that "[a]lthough the degree of

3  reliability of polygraph evidence may depend upon a variety of identifiable factors, there is

4  simply no way to know in a particular case whether a polygraph examiner's conclusion is

5  accurate, because certain doubts and uncertainties plague even the best polygraph exams."

6  *United States v. Scheffer*, 523 U.S. 303, 312.(1998). While *Scheffer* did not address a capital

7  defendant's right to present such evidence, at least one circuit court of appeals has held that the

8  case supports a holding that the exclusion of polygraph results passes "constitutional muster" in

9  the capital context. *United States v. Fulks*, 454 F.3d 410, 434 (4th Cir. 2006) (relying on *Goins v.*

10  *Angelone*, 52 F. Supp. 2d 638, 675 (E.D. Va. 1999), which was affirmed by *Goins v. Angelone*,

11  226 F.3d 312, 326 n. 7 (4th Cir. 2000)); *see also Garza v. Shinn*, 2021 WL 5850883, at *25-28

12  (D. Ariz. Dec. 9, 2021). At a minimum, fairminded jurists could disagree on whether the Nevada

13  Supreme Court made the correct decision. As such, federal habeas relief is not available for this

14  claim. *See Richter*, 562 U.S. at 101.

15        Claim 3 is denied.

16                    *Claim 7A*

17        In Claim 7A, Emil alleges that his constitutional rights were violated when the trial court

18  allowed the State to assert the prior murder as an aggravating circumstance because, at the time

19  of Charles' murder, he lacked notice that the circumstance could be imposed. Emil relies on the

20  fact that he had yet to be convicted, charged, or even arrested for the 1983 Tolley murder when

21  the 1984 Charles Emil murder occurred. Emil argues that the proper interpretation of Nev. Rev.

22  Stat. § 200.033(2)[7] is that a prior murder conviction could be used as an aggravating

23

---

[7] At the time of Charles' murder, Nev. Rev. Stat. § 200.033(2) provided:

circumstance only if the conviction predated the murder for which the State sought the death penalty. Citing *Gallego v. State*, 711 P.2d 856 (Nev. 1985), he also points out that the Nevada Supreme Court did not construe the meaning of Nev. Rev. Stat. § 200.033(2), with respect to the timing of the murders and convictions, until a year after Charles' murder.

The Nevada Supreme Court rejected this claim on direct appeal:

> Emil insists that the lower court erred in denying his motion to strike and in admitting evidence of a prior conviction at his penalty hearing. Emil argues that at the time of his stepfather's murder he had not been convicted, charged or even arrested for a March, 1983 murder. Emil contends, therefore, that under NRS 200.033(2), the 1983 murder should not qualify as an aggravating circumstance.
>
> In *Gallego v. State*, 101 Nev. 782, 711 P.2d 856 (1985), the defendant made a similar argument. However, this court stated in response:
>
>> Aggravating circumstances, as defined by the statute, provide direction to the sentencing authority as it considers an appropriate punishment for the defendant. The statute was never intended to operate on the vagaries of conviction sequences. Instead, the focal point is the time of sentencing. The sentencing panel is entitled to consider all relevant aspects of the defendant's criminal background prior to rendering sentence.
>
> *Id*. at 792, 711 P.2d at 863–864.
>
> Emil urges this court to overrule *Gallego* and reinterpret NRS 200.033(2). He argues that the proper interpretation of the statute is that only prior felony convictions existing at the time of the murder under consideration can be used as an aggravating circumstance. We disagree. It would be both absurd and counterproductive for this court to construe the plain language of the statute so as to exclude murders occurring before the primary offense and for which convictions are obtained prior to the penalty phase of a defendant's trial. *Cf. Gallego*, 101 Nev. at 793, 711 P.2d at 864.

---

**Circumstances aggravating first degree murder**. The only circumstances by which murder of the first degree may be aggravated are:

....

2. The murder was committed by a person who was previously convicted of another murder or of a felony involving the use or threat of violence to the person of another.

1  *Emil*, 784 P.2d at 960 (footnote omitted).

2        Emil argues that the Nevada Supreme Court's decision is contrary to, and an

3  unreasonable application of *Bouie v. City of Columbia*, 378 U.S. 347 (1964), because he was not

4  provided notice of the aggravating circumstance at the time of the crime. In *Bouie*, the Supreme

5  Court reasoned that the Due Process Clause governs judicial construction similar to the way the

6  Ex Post Facto Clause governs legislative action. 378 U.S. at 353-54. Accordingly, the Court held

7  that the Due Process Clause prohibits retroactive application of a judicial construction of a

8  criminal statute that is so unforeseeable and indefensible that the defendant was deprived of "fair

9  warning that his contemplated conduct constitute[d] a crime." *Id*. at 354-55. The Supreme Court

10 reversed the convictions of the petitioners in *Bouie* because their conduct did not violate South

11 Carolina's trespass statute at the time the conduct occurred—that is, it was only South Carolina

12 Supreme Court's post hoc construction of the statute that rendered the conduct unlawful.

13       The Nevada Supreme Court's rejection of Emil's fair notice claim does not contravene

14 *Bouie*. At the time Emil committed the murder in this case, Nevada law gave him fair warning

15 that an aggravating circumstance for first degree murder was that "[t]he murder was committed

16 by a person who was previously convicted of another murder or of a felony involving the use or

17 threat of violence to the person of another." Nev. Rev. Stat. § 200.033(2) (1983). The Nevada

18 Supreme Court's decision in *Gallego* merely clarified that the statute required only that the

19 defendant stood convicted of a prior murder at the time of the introduction of that evidence in the

20 penalty phase of the proceeding in question. *See Gallego*, 711 P.2d at 864. The decision did not

21 interpret the statute in a way that was "so clearly at variance with the statutory language" and

22 without "the slightest support in prior [state court] decisions." *Bouie*, 378 U.S. at 356. Absent an

23 unreasonable state court decision of the type described in *Bouie*, this court must defer to a state

court's interpretation of state law. *See Estelle v. McGuire*, 502 U.S. 62, (1991) ("[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions"); *see also Bueno v. Hallahan*, 988 F.2d 86, 88 (9th Cir. 1993) (deferring to Arizona court's determination that a preparatory offense qualifies as a prior felony for purposes of an Arizona sentence enhancement provision). In sum, the Nevada Supreme Court's decision to deny relief was not contrary to, and an unreasonable application of, clearly established federal law.[8]

Claim 7A is denied.

*Claim 7B*

In Claim 7B, Emil alleges that his constitutional rights were violated when the trial court allowed the State to present evidence in the penalty phase about the circumstances of Tolley's death. He claims that testimony about the manner in which Tolley died and the loss suffered by the community was not admissible because the fact of the murder conviction could be easily established without such prejudicial testimony. In objecting to the admission of the evidence, trial counsel noted that a prior murder conviction certified by a court is sufficient to establish the aggravating circumstance with no need for the State to present evidence about the circumstances of the murder. ECF No. 304-2 at 9-10. Counsel distinguished a prior murder conviction from prior felonies that may require the State to demonstrate that the felony involved the use of threat or violence to another person to establish an aggravating circumstance. *Id*. at 10. Counsel also argued that the State was violating Emil's right to due process and effective assistance of counsel by forcing him to defend the Tolley murder in the penalty phase of the current case. *Id*. at 11-12.

---

[8] Emil also makes a very strained argument that the application of the aggravating circumstance in his case violated *Gregg v. Georgia*, 428 U.S. 153 (1976), because it lacked the penological justifications for the death penalty – i.e., retribution and deterrence. This argument, which appears for the first time in his reply to the respondents' answer, fails to cite single case applying *Gregg* in a similar manner.

The Nevada Supreme Court rejected Emil's claim of trial court error on direct appeal:

> Emil further contends that it was error for the trial court not to limit the evidence of his prior murder conviction to entry of a certified copy of the conviction....
>
> Under NRS 200.033(2), prior murder convictions constitute aggravating circumstances. In *Milligan v. State*, 101 Nev. 627, 708 P.2d 289 (1985), this court held that questions concerning the admissibility of evidence during the penalty phase are largely left to the trial judge's discretion. In *Jones v. State*, 101 Nev. 573, 707 P.2d 1128 (1985), a first degree murder and death penalty case, we determined that the penalty phase testimony of the victims of three prior felonious assaults was proper even though defense counsel offered to stipulate to the convictions. Specifically, we stated:
>
>> It is well established in Nevada that evidence of prior convictions is admissible at penalty hearings when relevant and credible and not dubious or tenuous. *See Biondi v. State*, 101 Nev. 252, 699 P.2d 1062 (1985); *Allen v. State*, 99 Nev. 485, 488, 665 P.2d 238 (1983). *See also* NRS 175.552. Although details of prior crimes undoubtably have a greater impact on a jury than a bare record conviction, their admission may aid the trier in assessing the character of a defendant. A defendant's character and his record are "relevant factors to be considered by a jury in imposing a penalty for a capital crime...." *Allen*, 99 Nev. at 488 [665 P.2d 238]. *See also Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).
>
> Id. at 578, 707 P.2d at 1132.
>
> Under *Jones*, it cannot be said that the admission of testimony concerning the prior murder conviction was an abuse of discretion. Specifically, it is reasonable to assume, as the State asserts, that the testimony was helpful in assessing Emil's character and in affixing the proper punishment. *See also Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (relevant factors to be considered by jury in imposing a penalty for a capital crime include the character and record of the individual offender). Therefore, we hold that it was proper to allow testimony relating to Emil's prior murder conviction.

*Emil*, 784 P.2d at 960-61. As noted above, the Nevada Supreme Court did determine that the trial court erred in admitting three particular items of evidence (autopsy photographs of the victim, evidence of the discernible odor coming from the car where the body was found, and testimony

45

1 that the victim was a "nice guy") but found the error harmless. *Id*. at 961.

2      Emil challenges both the decision to allow evidence beyond a certified copy of the

3 murder conviction and the determination that the admission of certain evidence was harmless.

4 With respect to the former, he contends that the Nevada Supreme Court's reliance on *Woodson v.*

5 *North Carolina*, 428 U.S. 280 (1976), was unreasonable because, rather than condoning the

6 presentation of additional evidence in support of the death penalty, the holding in that case was

7 intended to ensure that a jury is allowed to consider a defendant's character and record as a

8 *mitigating* factor. While Emil is correct with respect to the holding in *Woodson*, at least one

9 subsequent Supreme Court case appears to reject the premise that only the defendant, not the

10 State, can present evidence about the defendant's character in a capital case. In *Payne v.*

11 *Tennessee*, the Court held that, as a matter of fairness, the State may counteract mitigating

12 evidence about a defendant's character with evidence about "the specific harm caused by the

13 defendant." 501 U.S. 808, 825 (1991). While *Payne* involved victim impact evidence, the same

14 fairness rationale presumably applies to evidence about the defendant's character. In any case, no

15 Supreme Court case prohibits the State from presenting evidence about the character of the

16 defendant. Thus, the Nevada Supreme Court's decision allowing such evidence was not contrary

17 to federal law. *See Wright v. Van Patten*, 552 U.S. 120, 126 (2008) (per curiam); *Crater v.*

18 *Galaza*, 491 F.3d 1119, 1123 (9th Cir. 2007) (noting that Supreme Court has "explained that if

19 habeas relief depends upon the resolution of 'an open question in [Supreme Court] jurisprudence,

20 § 2254(d)(1) precludes relief'" (quoting *Carey v. Musladin*, 549 U.S. 70, 76 (2006) (alteration in

21 original)).

22      Emil quibbles about the appropriate standard of review, but the Nevada Supreme Court

23 applied the correct harmless error standard for a claim raised on direct appeal – i.e., harmless

1  beyond a reasonable doubt. *See Ayala*, 576 U.S. at 267. Emil also fails to recognize that this

2  court is required to review the state court's harmless error determination under the AEDPA

3  standard. *See id.* at 269. Because it cannot be said that the Nevada Supreme Court's decision was

4  so unreasonable as to be beyond debate among fairminded jurists, it is entitled to deference on

5  federal habeas review.

6      Claim 7B is denied.

7          *Claim 9B4*

8      In Claim 9B4, Emil alleges that his constitutional rights were violated because the trial

9  court refused to instruct the jury in a manner that allowed it to give meaningful consideration and

10  effect to the specific non-statutory mitigating circumstances that were central to his case. At trial,

11  defense counsel asked the court to issue an instruction listing seven mitigating circumstances for

12  the jury to consider. ECF No. 304-2 at 147. The seven mitigation circumstances were: (1) the

13  early death of Emil's biological father; (2) his abuse at the hands of his biological father; (3) his

14  removal from his family home at age 13, and the resulting time spent in foster homes and youth

15  penal camp facilities; (4) his abandonment by his family; (5) his redeeming good deeds, work in

16  obtaining a high school diploma while in the juvenile justice system, and his employment as a

17  painter; (6) his lack of maturity and age, 23-years old, at the time of the offense; and (7) his

18  having done well while previously incarcerated and the good behavior that results from his being

19  in a highly structured system. *Id*. at 167-69. The court denied the request on the grounds that the

20  listed circumstances were not included on the statutory list of mitigating circumstances and such

21  an instruction would constitute an undue comment on the evidence by the court. *Id*. at 147-48.

22  Instead, the court issued an instruction taken verbatim from Nev. Rev. Stat. § 200.035, which

23  provides that murder in the first degree may be mitigated by six listed mitigating circumstances

1 and "any other mitigating circumstance." ECF No. 153-12 at 13.

2 Emil argues that the trial court failed to follow Nev. Rev. Stat. § 175.554(1), which

3 provides that "[t]he court shall also instruct the jury as to the mitigating circumstances alleged by

4 the defense upon which evidence has been presented during the trial or at the hearing."

5 According to Emil, Nev. Rev. Stat. § 175.554 and Nev. Rev. Stat. § 200.035 were enacted in

6 response to Supreme Court decisions requiring a capital jury to "be provided with a 'vehicle for

7 expressing its reasoned moral response' to the defendant's case in mitigation." ECF No. 330 at

8 159 (quoting *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 257 (2007) (internal quotation omitted),

9 which relied on *Woodson*; *Proffitt v. Florida*, 428 U.S. 242 (1976); and *Jurek v. Texas*, 428 U.S.

10 262 (1976)). He argues that, in failing to follow Nev. Rev. Stat. § 175.554, the trial court

11 "eliminated the safeguards the legislature created … to ensure that the death penalty was not

12 applied in an unconstitutional way." *Id.*

13 Emil raised the trial court's failure to issue the non-statutory mitigating circumstances

14 instruction as an issue in his state post-conviction proceeding, both as a claim of trial court error

15 and as a basis for an ineffective assistance of appellate counsel claim. ECF No. 191-4 at 101-03,

16 113. Presumably because Emil did not raise the issue on direct appeal, the Nevada Supreme

17 Court addressed only the claim of ineffective assistance of appellate counsel. The court rejected

18 the claim because Emil had not "directed this court's attention to the proposed instruction" and

19 did not "assert, with specificity, what non-statutory mitigating factors the jury should have been

20 instructed to consider." ECF No. 150-6 at 9.

21 While this court does not consider the Nevada Supreme Court's decision to be an

22 adjudication on the merits subject to deference under AEDPA, Claim 9B4 fails under de novo

23 review. Emil is correct that, under Nevada law, he was entitled to jury instructions on non-

statutory mitigating circumstances for which he had presented evidence. *See Byford v. State*, 994 P.2d 700, 715 (2000). However, the principle established in the line of U.S. Supreme Court cases on which Emil relies, such as *Lockett* and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), is that the jury must be permitted to consider fully "any mitigating evidence providing a basis for a sentence of life rather than death" and "that such consideration would be meaningless unless the jury not only had such evidence available to it, but also was permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260 (2007) (internal quotation marks omitted).

Here, the jury was instructed that it may consider "any other mitigating circumstance." ECF No. 153-12 at 13. Emil was able to present his theories of mitigation to the jury in closing argument. Nothing stopped the jury from considering that argument and any evidence presented in mitigation. The United States Supreme Court has held that the absence of instructions on particular mitigating factors does not violate the Eighth and Fourteenth Amendments. *Buchanan v. Angelone*, 522 U.S. 269, 275 (1998). Thus, any error arising from the trial court's failure to issue Emil's requested instruction was not a constitutional error.

Claim 9B4 is denied.

*Claim 17*

In Claim 17, Emil alleges that his constitutional rights were violated because the trial court's instructions did not require the jury to find all the independent elements of first-degree murder – i.e., premeditation, willfulness, and deliberation. Prior to deliberating in the guilt phase of Emil's trial, the jury was instructed that "Murder of the First Degree is the willful, deliberate, and premeditated killing of another human being." ECF No. 151-8, at 8. An additional instruction read as follows:

> Premeditation is a design, a determination to kill, distinctly formed in the mind at any moment before or at the time of the killing.
>
> Premeditation need not be for a day, an hour or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the premeditation is followed by the act constituting the killing, it is willful, deliberate and premeditated murder.

*Id*. at 9. The jury instructions did not include any additional definitions of willful, deliberate, or premeditated.

The Nevada statutes define first degree murder, in relevant part, as a "willful, deliberate and premeditated killing." Nev. Rev. Stat. § 200.030(1)(a). The use of the foregoing instruction was condoned by the Nevada Supreme Court in *Kazalyn v. State*, 825 P.2d 578 (Nev. 1992), and is commonly referred to as the *Kazalyn* instruction. Shortly thereafter, the Nevada Supreme Court confirmed "that the terms deliberate, premeditated and willful are a single phrase, meaning simply that the actor intended to commit the act and intended death to result." *Powell v. State*, 838 P.2d 921, 927 (Nev. 1992). Eight years later, however, the Nevada Supreme Court ruled, in *Byford v. State*, 994 P.2d 700 (Nev. 2000), that the *Kazalyn* instruction was deficient because it defined only premeditation and failed to provide an independent definition for deliberation. *See Byford*, 994 P.2d at 713.

In *Polk v. Sandoval*, 503 F. 3d 903 (9th Cir. 2007), the court held that the *Kazalyn* instruction violates due process because it relieves the State "of its burden of proving every element of first-degree murder beyond a reasonable doubt." *Polk*, 503 F. 3d at 909. In *Babb v. Lozowsky*, 719 F.3d 1019 (9th Cir. 2013), however, the court determined that its holding in *Polk* regarding the constitutionality of the *Kazalyn* instruction was no longer good law in light of the intervening Nevada Supreme Court decision in *Nika v. State*, 198 P.3d 839 (Nev. 2008), which

explained "that *Byford* represented a change in, rather than a clarification of, [Nevada] law." *Babb*, 719 F.3d at 1029. Thus, in cases in which the conviction was final prior to the *Byford* decision, due process did not require independent definitions for premeditation and deliberation because, prior to *Byford*, they were not separate elements of the mens rea necessary for first degree murder. *See id*.

In a subsequent case, however, the Ninth Circuit determined that, prior to *Powell*, "deliberation was a discrete element of first-degree murder in Nevada." *Riley v. McDaniel*, 786 F.3d 719, 723 (9th Cir. 2015) ("*Riley I*"). Having so determined, the court held that the use of the *Kazalyn* instruction at Riley's trial in 1990 (i.e., pre-*Powell*) violated his right to due process under the United States Constitution. *Id*. at 724. The court also concluded that Riley was entitled to habeas relief because the error was not harmless based on the "uncontested facts" in his case. *Id*. at 725. Noting that his trial also occurred prior to *Powell*, Emil claims that he is entitled to habeas relief for the same reason Riley was granted relief.

This court has questioned the Ninth Circuit's analysis of Nevada law in *Riley I*. *See Howard*, 392 F. Supp. 3d at 1212-13. And, as noted in *Howard*, the Nevada Supreme Court has also stated its disagreement with *Riley 1*. *See Leavitt v. State*, 386 P.3d 620, 620–21 (Nev. 2016). Even so, the Ninth Circuit has stood by its holding that "before and after *Powell*, the Nevada Supreme Court interpreted its first-degree murder statute to include three distinct mens rea elements." *See Riley v. Filson*, 933 F.3d 1068, 1074 (9th Cir. 2019) ("*Riley II*"). The court in *Riley II* distinguished between Nevada law requiring "separate *definitions* of the statutory mens rea elements" and "Nevada law concerning whether the mens rea terms were separate *elements*." *Riley II*, 933 F.3d at 1073 (emphasis in the original). The court held that only the latter is relevant to its decision in *Riley I*. *Id*.

Bound by *Riley I*, this court concludes that Emil's right to due process was violated by the use of the *Kazalyn* instruction in the guilt phase of his trial because the instruction "relieved the state of the burden of proof on whether the killing was deliberate as well as premeditated." *Polk*, 503 F.3d at 910. The question then is whether "this instructional error 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Riley I*, 786 F.3d at 724–25 (quoting *Brecht*, 507 U.S. at 637). More specifically, the "error is harmless if [the court] can say with fair assurance that it did not have a substantial effect, injurious to the defendant, on the jury's decision-making process." *Arnold v. Runnels*, 421 F.3d 859, 867 (9th Cir. 2005) (citing *Brecht*, 507 U.S. at 631; *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)).

The element of deliberation can be established through circumstantial evidence that a defendant engaged in a "dispassionate weighing process and consideration of consequences before acting." *Byford*, 994 P.2d at 714. "A deliberate determination may be arrived at in a short period of time." *Id*. "Evidence of premeditation and deliberation is seldom direct," and circumstantial evidence may "provide the substantial evidence required." *Briano v. State*, 581 P.2d 5, 7 (Nev. 1978).

As recounted by the Nevada Supreme Court on direct appeal, evidence presented at trial established that, on the day of the murder, Emil arranged to meet Charles Emil in a "desert area." *Emil*, 784 P.2d at 957. The evidence also showed that, when "Carmack pulled his truck alongside [Charles Emil's] pickup truck parked just off the road, … Emil immediately stood up in the back of Carmack's truck, pulled a revolver from a paper bag and fired four shots at the occupant of the . . . truck." *Id.* In addition, the jury was also presented with evidence that "Woodall … told police that approximately two weeks before the victim was killed, Emil told Woodall that $10,000 could be made if his stepfather was killed." *Id*. at 958. This court can say with fair assurance that

52

1  the jury, if properly instructed, would have concluded beyond a reasonable doubt that the

2  evidence "demonstrated not only willfulness and premeditation, but also cool, reflective

3  deliberation." *Riley I*, 786 F.3d at 726.

4       Claim 17 is denied.

5       **Cumulative Error Claim**

6            *Claim 15*

7       In Claim 15, Emil alleges that his conviction and death sentence are unconstitutional "due

8  to the cumulative errors in the admission of evidence and instructions, gross misconduct by state

9  officials and witnesses, and the systematic deprivation of [his] right to the effective assistance of

10 counsel." ECF No. 244 at 213. Under Ninth Circuit precedent, habeas relief may be available

11 based on the aggregate effect of multiple errors even though the errors considered in isolation do

12 not rise to the level of a constitutional violation. *See Davis v. Woodford*, 384 F.3d 628, 654 (9th

13 Cir.2003). "[C]umulative error warrants habeas relief only where the errors have 'so infected the

14 trial with unfairness as to make the resulting conviction a denial of due process.'" *Parle v.

15 Runnels*, 505 F.3d 922, 927 (9th Cir.2007) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637,

16 643 (1974)).

17      The only errors this court has identified in the guilt phase are the improper suppression of

18 impeachment material in relation to Woodall and Detective Dillard and the unconstitutional

19 *Kazalyn* instruction. Overwhelming evidence supported a finding that Emil committed a willful,

20 deliberate and premeditated killing. Even considered in the aggregate, these errors fall short of

21 rendering the guilt phase of the trial fundamentally unfair. Likewise, the two errors the court has

22 identified in the penalty phase – i.e., the admission of certain evidence in relation to the Tolley

23 murder and the trial court's refusal to issue Emil's requested instruction listing specific

1  mitigating circumstances – do not call into question the validity of the death penalty verdict

2  when considered together.

3    Claim 15 is denied.

4  **Appellate IAC Claims**

5    In Claim 18, Emil raises several claims of ineffective assistance of appellate counsel. The

6  Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective

7  assistance of counsel on his or her first appeal as of right. *Evitts v. Lucey*, 469 U.S. 387, 391–405

8  (1985). Claims of ineffective assistance of appellate counsel are reviewed according to the

9  standard set out in *Strickland*. *Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989). A

10  defendant therefore must show that counsel's performance fell below an objective standard of

11  reasonableness and that there is a reasonable probability that, but for counsel's unprofessional

12  errors, he would have prevailed on appeal. *Id.* at 1434 & n. 9 (citing *Strickland*, 466 U.S. at 688,

13  694). Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue

14  requested by the defendant. *Jones v. Barnes*, 463 U.S. 745, 751–54 (1983). The weeding out of

15  weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.

16  *Miller*, 882 F.2d at 1434.

17    *Claim 18(a)*

18    In Claim 18(a), Emil claims that appellate counsel was ineffective by failing to raise as an

19  issue on appeal the unconstitutionality of guilt phase Instruction Number 6, which improperly

20  shifted the burden on the presumption of implied malice. The Nevada Supreme Court rejected

21  this claim in Emil's state post-conviction proceeding. ECF No. 150-6 at 7 n.10. As noted in the

22  discussion of Claim 9B, above, the jury's verdict of first degree murder necessarily required the

23  jury to find that the killing was "willful, deliberate and premeditated," which means that the jury

found express malice. Any error with respect to the instruction concerning implied malice was harmless and not reasonably probable grounds for reversal.

Claim 18(a) is denied.

### Claim 18(b)

In Claim 18(b), Emil claims that appellate counsel was ineffective by failing to raise as an issue on appeal the unconstitutionality of the *Kazalyn* instruction. The Nevada Supreme Court rejected this claim in Emil's state post-conviction proceeding. ECF No. 150-6 at 7 n.10. As noted in the discussion of Ground 17, above, there was overwhelming evidence that the killing was willful, premeditated, and deliberate. While testifying in Emil's state post-conviction proceeding, defense counsel agreed that the premeditation instruction was not "of paramount concern" given the facts of the case. ECF No. 153-9 at 13-14. Any error with respect to the *Kazalyn* instruction was harmless and not reasonably probable grounds for reversal.

Claim 18(b) is denied.

### Claim 18(c)

In Claim 18(c), Emil claims that appellate counsel was ineffective by failing to raise as an issue on appeal the unconstitutionality of the instruction on reasonable doubt issued in the guilt phase (Instruction No. 18) and the penalty phase (Instruction No. 11). The Nevada Supreme Court rejected this claim in Emil's state post-conviction proceeding. ECF No. 150-6 at 7 n.10. As discussed above, the Ninth Circuit has determined that the instruction is constitutional. *Ramirez*, 136 F.3d at 1211–15; *see also Nevius*, 218 F.3d at 944–45. It is not reasonably probable that an argument based on the constitutionality of the reasonable doubt instruction would have been successful.

Claim 18(c) is denied.

1      *Claim 18(d)*

2      In Claim 18(d), Emil claims that appellate counsel was ineffective by failing to argue on

3  appeal that Emil was denied his constitutional right to due process by the State's failure to

4  provide the blood-spatter analysis to Emil's trial counsel prior to trial. As noted above, the

5  Nevada Supreme Court rejected this claim in Emil's state post-conviction proceeding because

6  trial counsel had failed to preserve the issue for appeal and because Emil failed to demonstrate

7  prejudice. ECF No. 150-6 at 7. For reasons discussed above in relation to Claims 1D and 1D1,

8  that decision was neither contrary to nor an unreasonable application of clearly established law

9  as determined by the United States Supreme Court.

10      Claim 18(d) is denied.

11      *Claim 18(e)*

12      In Claim 18(e), Emil claims that appellate counsel was ineffective by failing to argue on

13  appeal that Emil was denied his right to due process and a reliable sentence by the State's failure

14  to give notice of the substance of testimony and evidence to be presented at the penalty hearing.

15  The Nevada Supreme Court rejected this claim in Emil's state post-conviction proceeding by

16  noting that Emil had raised a lack of notice claim on direct appeal and that his "current claim is

17  simply a more precisely focused argument of his prior claim and, thus, is barred by the doctrine

18  of the law of the case." *Id*. at 10 (citation and footnote omitted). Emil fails to explain to this court

19  how appellate counsel's argument (ECF No. 191-1 at 37-44) was deficient.

20      Claim 18(e) is denied.

21      *Claim 18(f)*

22      In Claim 18(f), Emil claims that appellate counsel was ineffective by failing to argue on

23  appeal that Emil's right to an individualized sentence was denied by the trial court's refusal to

instruct the jury regarding non-statutory mitigating circumstances. As noted above, the Nevada

Supreme Court rejected this claim because Emil had not "directed this court's attention to the

proposed instruction" and did not "assert, with specificity, what non-statutory mitigating factors

the jury should have been instructed to consider." ECF No. 150-6 at 9.

While this court has been informed of the mitigating factors contained in the proposed

instruction (ECF No. 304-2 at 167-69), Emil still cannot establish a reasonable probability that

the issue would have prevailed on appeal. As noted in the discussion of Claim 9B4, above, the

jury was instructed that it may consider "any other mitigating circumstance." ECF No. 153-12 at

13. In addition, Emil was able to present his theories of mitigation to the jury in closing

argument, and nothing stopped the jury from considering that argument and any evidence

presented in mitigation. Under these circumstances, the Nevada Supreme Court would not have

found reversible error. *See Byford v. State*, 994 P.2d 700, 715 (2000).

Claim 18(f) is denied.

*Claim 18(g)*

In Claim 18(g), Emil claims that appellate counsel was ineffective by failing to argue on

appeal that Emil's right to an individualized sentence was denied by the trial court's refusal to

permit introduction of evidence at the penalty hearing that Frederick Woodall had undergone and

failed a polygraph test. The Nevada Supreme Court rejected this claim in Emil's state post-

conviction proceeding for the exact same reason it rejected the claim raised in Claim 18(e) – i.e.,

by noting that Emil had raised the claim on direct appeal and that his "current claim is simply a

more precisely focused argument of his prior claim and, thus, is barred by the doctrine of the law

of the case." *Id*. at 10 (citation omitted). Here again, Emil fails to explain to this court how

appellate counsel's argument (ECF No. 191-1 at 35-36) was deficient.

1     Claim 18(g) is denied.

2         *Claim 18(h)*

3     In Claim 18(h), Emil claims that appellate counsel was ineffective by failing to raise as

4 an issue on appeal the unconstitutionality of the jury instruction issued in the penalty phase

5 informing the jurors that their verdicts as to mitigating circumstances must be unanimous. The

6 Nevada Supreme Court rejected this claim in Emil's state post-conviction proceeding. ECF No.

7 150-6 at 7 n.10. For reasons explained in the discussion of Claim 9B, above, there is not a

8 reasonable probability that the Nevada Supreme Court would have found the instruction to be

9 reversible error.

10     Claim 18(h) is denied.

11     IV.  CONCLUSION

12     For the reasons set forth above, Emil is not entitled to habeas relief.

13             *Certificate of Appealability*

14     Because this is a final order adverse to the petitioner, Rule 11 of the Rules Governing

15 Section 2254 Cases requires the court to issue or deny a certificate of appealability (COA).

16 Accordingly, the court has *sua sponte* evaluated the claims within the petition for suitability for

17 the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th

18 Cir. 2002).

19     Under 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a

20 substantial showing of the denial of a constitutional right." With respect to claims rejected on the

21 merits, a petitioner "must demonstrate that reasonable jurists would find the district court's

22 assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473,

23 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a

COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*

The COA standard is not high.  Emil must only "'sho[w] that reasonable jurists could debate'" the district court's resolution or that the issues are "'adequate to deserve encouragement to proceed further.'" *Hayward v. Marshall*, 603 F.3d 546, 553 (9th Cir. 2010) (en banc) (citations omitted). Having reviewed its determinations and rulings in adjudicating Emil' petition, the court concludes that the *Slack* standard is met with respect to its resolution of Claim 1B, above. The court therefore grants a certificate of appealability as to that issue. The court declines to issue a certificate of appealability for its resolution of any procedural issues or any of Emil's other habeas claims.

**IT IS THEREFORE ORDERED** that Emil's fourth amended petition for writ of habeas corpus (ECF No. 244) is DENIED. The Clerk shall enter judgment accordingly and close this case.

**IT IS FURTHER ORDERED** that a certificate of appealability is GRANTED as to the following issue:

Whether this court erred in concluding that it must defer, under § 2254(d), to the Nevada Supreme Court's determination that Emil was not prejudiced by the State's improper suppression of evidence related to Frederick Woodall.

A certificate of appealability is otherwise DENIED.

Dated: April 10, 2024

_____
KENT J. DAWSON
UNITED STATES DISTRICT JUDGE